UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JULIE P.,[1]

                                       Plaintiff,         Case # 22-cv-6222-FPG

v.                                                                     DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                                       Defendant.
_____

## INTRODUCTION

On November 8, 2018, Plaintiff Julie P. protectively applied for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act (the "Act"). Tr.[2] 14. The Social Security Administration (the "SSA") denied her claim and Plaintiff appeared at a hearing before Administrative Law Judge ("ALJ") Gretchen Mary Greisler on October 21, 2020. *Id.* Following the hearing, on July 8, 2021, the ALJ issued an unfavorable decision. Tr. 11. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the SSA. Tr. 1. Plaintiff then appealed to this Court.[3] ECF No. 1.

Plaintiff moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Defendant moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). ECF Nos. 8, 10. For the reasons that follow, Plaintiff's motion is DENIED, the Commissioner's motion is GRANTED, and the ALJ's decision is AFFIRMED.

---

[1] In order to better protect personal and medical information of non-governmental parties, this Decision and Order will identify the plaintiff using only his first name and last initial in accordance with this Court's Standing Order issued November 18, 2020.

[2] "Tr." refers to the administrative record in this matter. ECF No. 7.

[3] The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c)(3).

1

**LEGAL STANDARD**

**I.     District Court Review**

When reviewing a final decision of the SSA, it is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. §§ 405(g), 1383(c)(3)) (other citation omitted). The Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted).

**II.    Disability Determination**

To determine whether a claimant is disabled within the meaning of the Act, an ALJ follows a five-step sequential evaluation: the ALJ must determine (1) whether the claimant is engaged in substantial gainful work activity; (2) whether the claimant has any "severe" impairments that significantly restrict his or her ability to work; (3) whether the claimant's impairments meet or medically equal the criteria of any listed impairments in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and if they do not, what the claimant's residual functional capacity ("RFC") is; (4) whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work; and (5) whether the claimant's RFC permits him or her to perform alternative substantial gainful work which exists in the national economy in light of her age, education, and work experience. *See Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *see also* 20 C.F.R. § 416.920.

## DISCUSSION

**I.     The ALJ's Decision**

The ALJ analyzed Plaintiff's claim using the process described above.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 13, 2018, the alleged onset date.  Tr. 17.  At step two, the ALJ found that Plaintiff had the following severe impairments: anxiety, depression, spine disorder, pulmonary impairment, obesity, and essential tremor.  *Id.*  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments.  *Id.* at 17-20.  In her step three analysis, the ALJ found that Plaintiff had mild limitations in her ability to understand, remember, and apply information or manage herself and moderate limitations in her ability to interact with others and concentrate, persist, and maintain pace.  *Id.* at 18-19.  The ALJ then determined that Plaintiff maintained the RFC to perform light work with certain limitations, including that she retained the ability to "perform simple tasks, make simple decisions and tolerate occasional minor changes."  *Id.* at 20.

At step four, the ALJ concluded that Plaintiff could not perform her past relevant work.  Tr. 26.  At step five, the ALJ, relying on vocational expert testimony, concluded that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including laundry folder, addresser, and charge account clerk.  Tr. 26.  Accordingly, the ALJ concluded that Plaintiff was not disabled.  *Id.*

## II. Analysis

Plaintiff argues that remand is required because (i) the ALJ erroneously failed to either include certain mental functional limitations in the RFC or adequately explain why she declined to do so, and (ii) the ALJ and Administrative Appeals Judges ("AAJs") were not properly appointed and therefore had no legal authority to adjudicate Plaintiff's claim. For the reasons set forth below, the Court concludes that both arguments are without merit.

### I. The Federal Vacancies Reform Act

The Court begins with Plaintiff's argument that Acting Commissioner Nancy Berryhill was serving in violation of the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C.§§ 3345-3349d, when she ratified the appointments of the ALJ and AAJs assigned to Plaintiff's case. Specifically, she argues that because over 210 days had passed since Berryhill assumed the role of Acting Commissioner, her appointment of the ALJ and presiding AAJs on July 16, 2018—and any decision they rendered—was invalid. Defendant contends that the FVRA permitted Berryhill to resume service as Acting Commissioner during the pendency of Andrew Saul's nomination for the office of Commissioner from the date the President submitted his nomination to the Senate on April 17, 2018 even though the 210-day period had expired in November 2017. As explained below, the Court agrees with Defendant.

#### a. The FVRA

The FVRA permits certain individuals to serve temporarily in "principal officer" positions, which normally require Presidential nomination and Senate confirmation. *See* 5 U.S.C. § 3347(a). By default, the first assistant to the principal officer serves in an acting capacity. *Id.* § 3345(a)(1). Alternatively, the President (and only the President) may direct either a Senate-confirmed official

serving elsewhere or an official in the same agency, who satisfies certain requirements, to fill the role. *Id.* § 3345(a)(1)-(2).

"Acting officials may only serve for designated periods of time, however." *Ortiz v. Comm'r of Soc. Sec.*, 21-CV-5478, 2023 WL 2375580, at *2 (E.D.N.Y. March 7, 2023). An acting official may serve "for no longer than 210 days beginning on the date the vacancy occurs" or "once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346(a)(1)-(2). A special rule extends the 210-day period for vacancies that occur during the first 60 days after a Presidential transition. *See id.* § 3349a. When a vacancy "exists during the 60-day period beginning on a transitional inauguration day," the 210-day period under section 3346(a) runs from the later of 90 days after inauguration or 90 days after the date of the vacancy. *See id.* § 3349a(b).

The FVRA also provides for enforcement of these time limits. "Unless an acting official is performing the functions and duties in accordance" within the limits set forth in section 3346(a), "the office shall remain vacant" and "only the head of such Executive agency may perform any function or duty of such officer." 5 U.S.C. § 3348(b)(1)-(2). "An action taken by any person" not acting in compliance with section 3346(a) "shall have no force or effect." *Id.* § 3348(d)(1). Nor may any such action later be ratified. *Id.* § 3348(d)(2). In other words, "[t]he FVRA's enforcement provision renders all actions taken by improperly serving acting officials void." *Ortiz*, 2023 WL 2375580, at *2.

b. **Berryhill's Service as Acting Commissioner**

Berryhill, who had previously served as SSA's Deputy Acting Commissioner of Operations, became Acting Commissioner on January 21, 2017. ECF No. 10-1 at 19. According to Defendant, she served for 300 days, until November 16, 2017 and later resumed serving as

5

Acting Commissioner on April 17, 2018, when the President submitted Saul's nomination to the Senate.[4] *Id.* Plaintiff argues that she served continuously—and unlawfully—from January 20, 2017 to June 17, 2019, when Saul became Commissioner. ECF No. 8-1 at 11; ECF No. 11 at 7-8.

On July 16, 2018, Berryhill ratified the appointments of the SSA's ALJs and AAJs following the Supreme Court's decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044, in which the Supreme Court held that Securities and Exchange Commission ALJs were "Officers of the United States" within the meaning of the Appointments Clause. *See* SSR 19-1p, 2019 WL 1324866, at *2 (March 15, 2019); *see also* Social Security Emergency Message 18003 REV 2, § B[5] ("On July 16, 2018, the Acting Commissioner ratified the appointment of ALJs and AAJs and approved their appointments as her own in order to address any Appointments Clause questions involving SSA claims.").

c. **Application of Section 3346(a)**

At issue here is whether section 3346(a)(2) allowed Berryhill to resume service as Acting Commissioner during the pendency of Saul's nomination even though the President nominated Saul after the 210-day period set forth in section 3346(a)(1) had already expired. The parties agree that Berryhill's term as Acting Commissioner under section 3346(a)(1) ended on November 16, 2017. *See* ECF No. 8-1 at 11-12; ECF No. 10-1 at 19. They disagree as to the effect of this expiration on her ability to serve as Acting Commissioner after the President submitted Saul's nomination to the Senate on April 17, 2018.

Plaintiff appears to incorporate by reference the rationale of two cases from the District of Minnesota, both of which held that Berryhill could not serve as Acting Commissioner pursuant to

---

[4] Because the vacancy occurred during the first 60 days of the transition between the Obama and Trump administrations, Berryhill could serve as Acting Commissioner for up to 300 days under section 3346(a)(1). *See* 5 U.S.C. § 3349a(b).
[5] Available at https://secure.ssa.gov/apps10/reference.nsf/links/08062018021025PM.

section 3346(a)(2) because she was not serving as Acting Commissioner when Saul was nominated. *See* ECF No. 8-1 at 12 (citing *Brian T.D. v. Kijakazi*, 580 F. Supp. 3d 615 (D. Minn. 2022), *rev'd sub nom. Dahle v. Kijakazi*, 62 F. 4th 424 (8th Cir. 2023); *Richard J.M. v. Kijakazi*, No. 19-CV-827, 2022 WL 959914 (D. Minn. Mar. 30, 2022)). Under this view, section 3346 "establishes a unified period of permissive service that may be tolled in certain circumstances." *Brian T.D.*, 580 F. Supp. 3d at 627. In other words, section 3346(a)(2) operates solely to toll the 210-day limit for an official already serving in an acting capacity when a nomination is submitted to the Senate. Defendant, on the other hand, argues that "[t]he great majority of courts that have addressed this issue agree that § 3346(a)(2) contains a 'spring-back' provision" that allowed Berryhill to resume her acting role when Saul was nominated. *See* ECF No. 10-1 at 21-22 (quoting *Williams v. Kijakazi*, No. 21-CV-141, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022)).

When interpreting a statute, "a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Seife v. U.S. Food & Drug Admin.*, 43 F. 4th 231, 239 (2d Cir. 2022) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019)). "That includes, 'reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). A court's reading of a statute should "give effect, if possible, to every clause and word, with no provision rendered superfluous." *Id.* (internal quotation marks and citations omitted).

Here, both the ordinary meaning and structure of section 3346 and the FVRA make clear that Berryhill was eligible to resume service as Acting Commissioner upon Saul's nomination on April 17, 2018. Section 3346(a) provides that an acting official may serve "for no longer than 210 days" after a vacancy occurs "*or*" during the pendency of a nomination submitted to the Senate

7

(emphasis added). "The use of 'or' as a connector between subsections 1 and 2 requires the subsections be given distinct, independent, meanings." *Dahle*, 62 F.4th at 427 (citing *United States v. Woods*, 571 U.S. 31, 45 (2013)). Accordingly, as the Eighth Circuit explained in rejecting the argument on which Plaintiff relies:

> Subsections 1 and 2 operate independently, providing distinct limitations on when an individual who is qualified to serve under 3345 may begin or end their service. Subsection 1 allows an individual to serve for 210 days after a vacancy occurs. Subsection 2 allows an individual to serve from the time a nomination is sent to the Senate until that nomination is no longer pending. Subsection 2 contains no time limit expressed in a number of days and speaks in no manner as to other requirements to serve as an acting officer. Rather, it provides a time limit through reference to Senate action. There is simply no textual basis to imply that subsection 1 and its 210-day limit somehow restrict a person's service under subsection 2.

*Dahle*, 62 F.4th at 427-28; *accord Rush v. Kijakazi*, 65 F. 4th 114, 123-24 (4th Cir. 2023). The term "or," therefore does not preclude an official who served pursuant to subsection (1) from also serving pursuant to subsection (2). *See Dahle*, 62 F. 4th at 427.

Moreover, the reference to the person "serving as an acting officer" in section 3346(a) does not require "that an individual be presently serving as Acting Commissioner under subsection 1 in order to serve under subsection 2." *Id.* at 428. Interpreting the statute that way "simply ignores the entirety of the clause, which states that the section applies to 'the person serving as an acting officer described *under section 3345*.'" *Hernandez v. Comm'r of Soc. Sec.*, No. 21-CIV-10658, 2022 WL 18402121, at *13 (S.D.N.Y. Dec. 16, 2022) (quoting 5 U.S.C. § 3346(a)). "The purpose of this clause, then, is to make plain that the time limitations imposed apply to those serving under Section 3345, and not some other vacancy statute or provision." *Id.*

The legislative history of the FVRA also supports this reading. The Senate Government Affairs Committee report on the FVRA stated that, under section 3346(a)(2), "an acting officer may serve more than 150 days if a first or second nomination is submitted to the Senate, and may

8

serve while that nomination is pending from the date the nomination is submitted." S. Rep. No. 105-250, 1998 WL 404532, at *14 (July 15, 1998).[6] The Committee further explained that the "acting officer may serve even if the nomination is submitted after the 150 days has passed, although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted." *Id.* To the extent that this time limit causes inconvenience to the executive branch, such inconvenience "can be eliminated instantly by the President's unilateral decision to make a nomination, for once such a nomination is made, the acting officer can resume service, including performing the non-delegable duties of the office." *Id.* The report therefore "precisely tracks what the plain language of the statute indicates," *Hernandez*, 2022 WL 18402121, at * 14, that is, that section 3346(a)(2) operates as a "spring-back" provision, not merely a tolling provision.

Plaintiff's reading of section 3346 therefore finds no support in the "language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Seife*, 43 F. 4th at 239. Accordingly, the Court joins the vast majority of courts that have considered this question and concludes that Berryhill could serve as Acting Commissioner from January 20, 2017 to November 16, 2017 pursuant to section 3346(a)(1) and resume service as Acting Commissioner beginning on April 17, 2018 when Saul's nomination was submitted to the Senate pursuant to section 3346(a)(2). *See e.g.*, *Ortiz*, 2023 WL 2375580, at *4; *Hernandez*, 2022 WL 18402121, at *15; *Bril v. Kijakazi*, No. 22-CV-2, 2022 WL 3702916, at *4 (W.D.N.C. Aug. 25, 2022); *Thomas S. v. Comm'r of Soc. Sec.*, No. 21-CV-5213, 2022 WL 268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022). While she could not lawfully serve as Acting Commissioner between those dates, because she was properly serving as Acting Commissioner when she ratified the

---

[6] The enacted version of the FVRA increased the number of days an individual could serve as an acting official from 150 to 210 days. *See* 5 U.S.C. § 3346(a)(1). This was the only change between the proposed language discussed in the Senate Report and the enacted version of the FVRA. *See Kring-Schreifels v. Kijakazi*, No. 22-CV-110, 2023 WL 3097210, at *10 (E.D. Pa. Apr. 26, 2023).

appointments of the ALJs and AAJs on July 16, 2018, they had proper authority to adjudicate Plaintiff's claim for benefits.

Plaintiff argues that this interpretation renders the 210-day limit a nullity, allowing the President to select someone to serve as the head of an agency in an acting capacity for "more than the 210 days allowed by statute and then after the fact rely on the fiction that this person had vacated their office for some period of time, even though that never occurred." *See* ECF No. 11 at 9. This ignores the role of the FVRA's enforcement provisions. Consider the following scenario. The President directs an official to serve as acting head of an agency and fails to submit a nomination to the Senate within 210 days. If, on day 211, the President has not submitted a nomination to the Senate, any act taken by that official purportedly in her acting capacity would "have no force or effect." 5 U.S.C. § 3348(d)(1). And, even if the President later submitted a nomination to the Senate and that official returned to her acting role under section 3346(a)(2), neither she nor any other official could ratify her prior act. *Id.* § 3348(d)(2). Interpreting section 3346(a)(2) as a spring-back provision therefore does not undermine the FVRA's role in limiting the President's ability to unduly rely on acting officials. Instead, it continues to "give effect . . . to every clause and word, with no provision," including section 3346(a)(1), "rendered superfluous." *Seife*, 43 F. 4th at 239.

Because the FVRA permitted Berryhill to resume her service as Acting Commissioner on April 17, 2018, she was properly serving as Acting Commissioner when she ratified the appointment of the SSA's ALJs and AAJs on July 16, 2018. *See Dahle*, 62 F.4th at 429-30. They could therefore adjudicate Plaintiff's claim, and she is not entitled to a *de novo* hearing before a different ALJ.

**II.     The RFC**

The Court now turns to Plaintiff's challenge to the ALJ's RFC determination. Plaintiff argues that remand is warranted because the ALJ failed to either incorporate certain mental limitations that she described at steps two and three into the RFC or adequately explain why she declined to do so. ECF No. 8-1 at 6-7. Defendant contends that the ALJ appropriately considered Plaintiff's mental impairments and that the mental limitations present in the RFC adequately accommodate the limitations described at step two of the ALJ's analysis. *See* ECF No. 10-1 at 13-14. As explained below, the Court agrees with Defendant.

In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). A person's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *see also Riederer v. Comm'r of Soc. Sec.*, 464 F. Supp. 3d 499, 503 (W.D.N.Y. 2020) ("'Residual functional capacity' is defined as the most work a claimant can still do despite limitations from an impairment and/or its related symptoms."). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "An RFC finding will be upheld when it is supported by 'substantial evidence' in the record." *Riederer*, 464 F. Supp. 3d at 503 (citation omitted).

Prior to formulating a person's RFC, at steps two and three of the sequential evaluation process, the regulations require an ALJ to evaluate mental impairments using a "special technique." 20 C.F.R. §§ 404.1520a(a), 416.921a(a). If a claimant is found to have a medically determinable mental impairment, the ALJ must assess the claimant's degree of resulting limitations in four broad functional areas: understanding, remembering, or applying information;

interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). In each area, the ALJ uses a five-point scale to rate the degree of a claimant's degree of limitation: none, mild, moderate, marked, and extreme. *Id.* §§ 404.1520a(c)(4), 416.920a(c)(4). As relevant here, a mild limitation indicates that a person's "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited," 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00F(2)(b), while a moderate limitation indicates that a person's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." *Id.* § 12.00F(2)(c).

The limitations identified using this special technique "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). "[T]he mental RFC assessment at steps 4 and 5 of the sequential evaluation process," on the other hand, "requires a more detailed assessment," which involves "itemizing various functions found in paragraphs B and C of [the Listings]." *Id.*

While an ALJ may not avoid conducting that more detailed assessment "by merely indicating that the claimant can perform simple, unskilled work," *Karabinas v. Colvin*, 16 F. Supp. 3d 206, 215-16 (W.D.N.Y. 2014), a determination made at step three "need not carry over verbatim to the ultimate RFC determination because the two determinations require distinct analysis," *Richard B. v. Comm'r of Soc. Sec.*, No. 20-CV-585, 2021 WL 4316908, at *6 (W.D.N.Y. Sept. 23, 2021). "The regulations make clear that [the step three factors] are only to be applied in determining the severity of a mental impairment . . . not a claimant's RFC, which is relevant to the . . . fourth and fifth steps." *Whipple v. Astrue*, 479 F. App'x 367, 369 (2d Cir. 2012) (summary order). "While the analysis at steps two and three concerns the functional effects of mental

impairments, the RFC analysis at step four specifically considers *work-related* physical and mental activities in a *work setting*." *Chappel v. Comm'r of Soc. Sec.*, No. 18-CV-1384, 2020 WL 1921222, at *6 (W.D.N.Y. Apr. 21, 2020).

Plaintiff's contention that the ALJ failed to undertake the requisite detailed assessment is belied by the record, which demonstrates that the ALJ identified and evaluated specific evidence in the record relevant to Plaintiff's mental functioning. The ALJ noted that that during a consultative examination, Plaintiff "reported experiencing anxiety when away from home and in crowds, and has issues with her short-term memory, concentration, organization, and planning." Tr. 21 (citing Tr. 495-96). The ALJ then noted that Plaintiff had been in therapy in the past, but "had never been hospitalized for psychiatric reasons." *Id.* Moreover, according to the examiner, Plaintiff's "recent and remote memory skills were mildly impaired," and her "intellectual function was estimated to be between the below average and borderline ranges, with a somewhat limited general fund of information." *Id.* On the other hand, Plaintiff was cooperative, demonstrated adequate social skills, and was oriented to person, time, and place "with a clear sensorium." *Id.*

The ALJ also discussed the "persuasive" opinion of a psychiatric consultative examiner and the opinions of state agency medical psychiatric consultants. Psychiatric consultative examiner Amanda Slowik, Psy. D., opined that Plaintiff had "no more than moderate limitations in mental health work related functions," Tr. 23. Specifically, Dr. Slowik opined that:

> The claimant's ability to understand, remember, and apply simple directions and instructions and interact adequately with supervisors, co-workers, and the public is mildly limited. The claimant's ability to understand, remember, and apply complex directions and instructions and regulate emotions, control behavior, and maintain well-being is moderately limited. The claimant's ability to use reason and judgment to make work-related decisions; sustain an ordinary routine and regular attendance at work . . . is not limited. The claimant's ability to sustain concentration and

   perform a task at a consistent pace is mildly to moderately limited. Difficulties are caused by distractibility, cognitive deficits, and anxiety.

*Id.* at 497-98. The ALJ noted that Dr. Slowik's opinion was supported by the "noted findings from the Doctor's examination of the claimant" and was "consistent with the totality of the record, including claimant's work history." *Id.* at 23-24.

  Dr. Slowik's opinion was also consistent with the opinions of two state agency medical psychiatric consultants, A. Chapman, Psy. D. and M. D'Ortona, Psy. D. Both consultants concluded that Plaintiff retained the "sustained capacity to meet the basic mental demands of competitive, remunerative, unskilled work including the ability to: understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting." Tr. 81, 115. The ALJ concluded that the state agency consultant's conclusions were supported by reports citing to evidence in the record and were consistent with the "totality of the record, including that [Plaintiff's] mental health status examinations were generally normal." *Id.* at 24.

  The ALJ also considered Plaintiff's reports of her own functioning. As the ALJ noted, on the "Function Report, [Plaintiff] indicated that she had no problem taking care of her grooming, dressing, showering, and feeding herself," and could microwave her own food or meals. Tr. 23 (citing Tr. 292). Plaintiff also reported that she prepares her own food, drives, goes out alone, and uses public transportation. *Id.* (citing Tr. 292-93). She also noted that she shops by phone or mail, reads books, and watches television. *Id.* She also stated that she retained the ability to "create arts and crafts that she planned on selling on Etsy while going out of work on disability." *Id.* (citing Tr. 667).

  In considering this evidence, the ALJ adequately assessed Plaintiff's ability to perform the mental activities required for unskilled work. "The mental activities 'generally required by

competitive, remunerative, unskilled work' include: (1) '[u]nderstanding, remembering, and carrying out simple instructions,' (2) '[m]aking judgments that are commensurate with the functions of unskilled work—i.e., simple work-related decisions', (3) '[r]esponding appropriately to supervision, co-workers and usual work situations,' and (4) '[d]ealing with changes in a routine work setting.'" *Ricci v. Berryhill*, No. 16-CV-1161, 2018 WL 1532602, at *9 (D. Conn. Mar. 29, 2018) (quoting SSR 96-9p, 1996 WL 374185, at *9 (July 2, 1996)).  The ALJ's conclusion that Plaintiff retained the ability to "perform simple tasks, make simple decisions and tolerate occasional minor changes" accounts for Plaintiff's mental limitations and is supported by the opinions of Drs. Slowik, Chapman, and D'Ortona.  Contrary to Plaintiff's contention that the ALJ adopted "absolutely no mental limitations in her RFC," limiting Plaintiff to simple tasks and decisions, with only occasional minor changes is a mental limitation that sufficiently accommodates Plaintiff's impairments.  *See Washburn v. Colvin*, 286 F. Supp. 3d 561, 566 (W.D.N.Y. 2017) ("It is well-settled that a limitation to unskilled work sufficiently accounts for moderate limitations in work-related functioning.").

Plaintiff's assertion that the ALJ should have included a social limitation in the RFC is likewise unavailing.  To start, Plaintiff's assertion that the state agency consultants found that Plaintiff had a "moderate limitation in her ability to interact with others," ECF No. 8-1 at 8, is questionable.  The consultants' reports instead indicate that she was "[n]ot significantly limited" in her ability to "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," "interact appropriately with the general public," "ask simple questions or request assistance," and "maintain socially appropriate behavior."  Tr. 80, 96, 114.  Her only moderate social limitation was in her ability to "accept instructions and respond appropriately to criticism from supervisors."  *Id.*  Despite this limitation, both state agency consultants concluded

that Plaintiff could "respond appropriately to supervision, coworkers, and usual work situations." *Id.*

In any event, to the extent that Plaintiff's moderate social limitation reflects a more general limitation in interacting with others, that alone does not compel the inclusion of a social limitation in the RFC. *See Harris v. Colvin*, 2015 WL 4041737, at *5 (N.D.N.Y. 2015). Because unskilled work "ordinarily involve[s] dealing primarily with objects, rather than with data or people," SSR 85-15, 1985 WL 56857, *4 (Jan. 1, 1985), "Plaintiff's difficulty dealing with others is already accounted for in the very nature of unskilled work," *Harris*, 2015 WL 4041737, at *5. Moreover, the record demonstrates Plaintiff's capacity to interact appropriately with others, as Plaintiff reported that she socialized with others by phone on daily, went shopping monthly, and had no problems "getting along with family, friends, neighbors, or others." Tr. 294-95. The ALJ's decision not to include a social limitation in the RFC is therefore supported by substantial evidence.

Plaintiff's challenges to the specific representative occupations identified at step five are no more persuasive. Plaintiff first argues that the ALJ failed to explain how Plaintiff could perform the occupation of charge account clerk, which, in her view has a "high reasoning level." ECF No. 8-1 at 7-8. The occupation of charge account clerk has a reasoning level of three, however, which falls squarely in the middle of the scale, which runs from one to six. *See* Charge Account Clerk, Dictionary of Occupational Titles (DOT) 205.367-014, 1991 WL 671715; App'x C, DOT, 1991 WL 688702 (1991). A finding that Plaintiff could perform the occupation of charge account clerk is therefore not inconsistent with an RFC limiting Plaintiff to simple tasks. *See Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 409 (D. Conn. 2012), *aff'd*, 515 F. App'x 32 (2d Cir. 2013) (holding

that the "limitation of only short, simple instructions is . . . not inconsistent with jobs requiring GED level 2 or 3 reasoning.").

Nor is the conclusion that Plaintiff could perform the occupations of laundry folder and addresser. Plaintiff contends that the ALJ failed to explain how she could perform these occupations, both of which involve performing repetitive or short-cycle work. ECF No. 8-1 at 9. In other words, they involve performing a "few routine and uninvolved tasks over and over again according to set procedures, sequence, or pace, with little opportunity for diversion or interruption." *Id.* (citing U.S. Dep't of Labor, Rev. Handbook for Analyzing Jobs (1991)). As Defendant correctly notes, this hardly undermines the ALJ's determination. Jobs, like laundry folder and addresser, that involve "few routine and uninvolved tasks" with "little opportunity for diversion or interruption" are perfectly consistent with an RFC limiting Plaintiff to performing "simple tasks," making "simple decisions," and tolerating only "occasional minor changes." Tr. 20.

In sum, Plaintiff has failed to demonstrate either that the ALJ committed legal error in formulating the RFC or that the RFC is unsupported by substantial evidence. Plaintiff has therefore failed to demonstrate that she is entitled to remand, and the ALJ's decision is affirmed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment, ECF No. 8, is DENIED, the Commissioner's motion for judgment on the pleadings, ECF No. 10, is GRANTED, and the decision of the Commissioner is AFFIRMED. The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated:  September 6, 2023
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York